E. E. Carnahan v. Missouri-Kansas-Texas Railroad Company,
a Corporation, Appellant.—88. S. W. (2d) 1027.

Division One, December 18, 1935.

*Carl S. Hoffman, W. H. Martin* and *Montgomery, Martin & Montgomery* for appellant.

24

*O. S. Hill* and *Cowgill & Popham* for respondent.

GANTT, P. J.—Action under the Federal Employers' Liability Act. Plaintiff was injured while serving defendant as switchman in its yard at Rosedale, Kansas. It was his duty to set the brake on cars switched to different tracks. In the performance of said duty he fell from the brake platform attached to the end of a car and was injured. Judgment for $20,000.

The petition charged that defendant negligently failed to inspect the brake platform and that as a direct result of said negligence, plaintiff was injured. The case was submitted to the jury on this charge of negligence. Defendant contends that its instruction, in the nature of a demurrer, should have been given at the close of the evidence. There was evidence tending to show the following:

The yard at Rosedale is a "good sized" railroad yard, with two night watchmen on duty. A large grain elevator is serviced by four of defendant's tracks extending north and south in said yard. The elevator is between Clinton and Mill streets, which streets intersect said tracks. The yard is not fenced, and the streets are main traveled thoroughfares of the city. Tracks one and two extend along the east side of the elevator, and cars on said tracks are loaded from the elevator. Tracks three and four extend along the west side of the elevator, and cars loaded with grain are "spotted" on said tracks south of the elevator, usually in the nighttime. In the morning the grain company moves the loaded cars northward to unloading pits under said tracks and adjacent to the elevator. The cars are unloaded into the pits and then moved northward. The pits are covered by a shed of sufficient height to clear a switchman standing on top of a car. The unloaded cars remain on said track until removed by a switching crew. Cars loaded with grain are received daily at the elevator.

In the shipment of grain, inside doors are used to prevent leakage from the car. They are placed across the inside of the door-

ways and nailed with eight penny nails to the posts on the sides of the doorways. They are made of two cheap pine boards twelve inches wide and fastened together with eighteen-inch cross boards. They use sufficient grain doors in a doorway to prevent leakage. In unloading a car the grain company forces claws or hooks under the grain door. On account of the grain in the car, the nails fastening the grain doors to doorway posts cannot be removed. The claws or hooks are attached to a cable which passes over a drum located above the car. Upon application of the power the grain door is either forced upward and onto the grain within the car, or the boards of which the grain door is made are broken. If broken, pieces of the boards are thrown in every direction. A piece of board may be thrown upward and against the roof of the shed, falling therefrom to the roof of the car. The unbroken grain doors are again used in cars. On the day in question and at ten forty-five P. M. a switch engine was coupled to ten empty cars on said elevator track. The engine and cars were then moved north and onto the lead track to be switched to different tracks in the yard. In an effort to set the brakes on moving cars switched to a certain track, plaintiff ascended a ladder on the end of one of the cars and stepped to the brake platform attached to the end of the car. In doing so he stepped on a piece of board on the platform which slipped and caused him to fall to the track and between the moving cars. It was a pine board eighteen inches long, tapering from one and one-half inches at one end to one inch at the other end. It was a part of a crosspiece which had been nailed to and held together the parts of a grain door.

At eight A. M. on the day plaintiff was injured and before the cars were unloaded at the elevator, an inspection of the car from which plaintiff fell, including the brake platform, was made by defendant's car inspector. At that time said board was not on the brake platform. If it had been on said platform it would have been the duty of the inspector to remove it. After the cars, including the car in question, were unloaded, and at three P. M. on that day, the inspector made a "commodity inspection" of the inside of the roof and the door posts, floor and sills of said car. He made no inspection of the brake platform of this or other cars after they had been unloaded.

Plaintiff tried and submitted his case to the jury on the theory that it was the custom of defendant to generally inspect cars after they had been unloaded by the grain company. There was evidence tending to sustain this theory of the plaintiff. On the contrary there was evidence tending to show that after the cars were unloaded it was the custom of defendant to make only an interior inspection. The jury found that defendant was negligent in failing to generally inspect the car after it was unloaded. However, it is not sufficient to authorize a recovery for the plaintiff to show that defendant was negligent. He must further show that said negligence was the proximate cause of the injury. In other words, he

must show that the board in question was on the brake platform at the time of the inspection of the car at three P. M. on the day in question. If the board was not on the platform at said time, the negligence of the inspector in failing to make a general inspection at said time could not be the proximate cause of the injury. In an effort to show causal connection, plaintiff introduced evidence tending to show that grain doors are sometimes broken in removing them from cars. It was the theory of plaintiff that a grain door of the cars in question was broken at the time the cars were unloaded, and that a piece of board from said grain door was thrown upward and fell on the brake platform. Of course, if this happened the board was on the brake platform at the time of the last inspection of the car and should have been removed by the inspector. At the request of plaintiff the cause was submitted to the jury on that theory.

There was no direct evidence tending to show that a grain door of any car in question was broken in unloading said cars, or was broken at any other time. But plaintiff contends that it is reasonable and legitimate to infer from the testimony of witnesses that a door was broken in unloading said cars. The testimony on the question follows:

EDWARD E. CARNAHAN:

"Q. State whether or not in your seven or eight years experience on this yard and with the company, whether you have become familiar with the method of unloading the grain cars and if you have observed them and are familiar with it? A. Yes, sir, I have watched them.

"Q. Explain how they would unload them and how they would get those grain door out? A. They pull those grain doors out with a power-lift.

"Q. Describe it in a general way and how it takes hold of them? A. They are shoved under the doors and they put the juice on them and it pulls them up; they are nailed in with small nails but just enough to hold them there.

"Q. And when the juice is thrown on and the power-lift lifts them up that way, does it break the doors sometimes? A. Yes, sir.

"Q. Where would it throw the pieces and where have you seen it throw them? A. Well, it would scatter the pieces; the pieces would break and they might fall down and they might go on the roof—I have seen the pieces fly on the roof.

"Q. In your actual experience, have you seen pieces fly there?

"Q. Have you seen it throw them on the roof ? A. Up against the roof.

"Q. Have you seen that a few times, or many times? A. Quite a number of times; I have been in and out of there for seven years.

"Q. State whether or not that was the usual and customary situation in unloading them? A. Yes, sir."

CROSS-EXAMINATION.

"Q. You say you had been there and saw them unload? A. Yes, sir, any number of times.

"Q. You didn't pay any attention to them? A. Well, I waited for cars, and would be there lots when they was unloading.

"Q. What happens to the doors when they pull them up? A. Sometimes they fall out on the ground.

"Q. Most of the time they go up, on the inside? A. Yes, sir.

"Q. The boards on the grain door are wider than the original door? A. Yes, sir.

"Q. When they hook those thing on them, it lifts them up by the side of the door? A. Sometimes, and sometimes they get side-ways, and sometimes they bust.

"Q. You talked about seeing boards hit the roof of the cars. Are you talking about the side of the cars? A. I said the roof. I said the roof of the shed, that the cars were under.

"Q. You have seen them throw these boards up and hit the roof of the shed? A. That is not so very high.

"Q. How high? A. Four foot above the cars, I guess; I can stand up straight.

"Q. Do you say that it is customary and usual for them to do that—throw the boards clear up and hit the top of the shed? A. Well, they don't do that all the time; every car will not do that.

"Q. Is that customary? A. Yes, sir.

"Q. It is nothing unusual for them to fly up and hit the top of the shed? A. No, sir.

"Q. How many would you say do that? A. Quite a few.

"Q. How many times did you ever see that happen? A. I could not say how many times.

"Q. You were not around very much to see it happen? A. Well, yes.

"Q. You were? A. Yes, sir.

"Q. Did you ever see a board on the cars, in that part of the yards? A. Yes, sir.

"Q. You did? A. Yes, sir, all over the yards; I have seen sticks and things laying on it.

"Q. I am not talking about the cars—I am talking about on a car. Tell me frankly, did you ever see a board on a car? A. Yes, sir.

"Q. Where? A. It came out of the elevator.

"Q. How many times did you see that? A. I couldn't say how many times, but I have seen it."

MAX C. SCOTT.

"Q. What was the general custom and practice and method of unloading grain out of the cars there, at the M-K-T elevator—what method did they use to get the doors out? A. They pulled the

grain doors out, and let the grain run out of the car, and they had a power-shovel to pull the grain out.

"Q. Tell how they would pull the doors out? A. They had a power-lift; they are not loose; they are nailed to the door frame.

"Q. This power-lift operates by mechanical power? A. Yes, sir.

"Q. When they apply the power-lift to the frail grain door, and turn the juice on it, what effect has that on the door? A. Something has to come.

"Q. What has been your experience, and observation, and what does come, when they apply that power? A. I see the doors tore up; if the nails hold the door, it breaks.

"Q. When the door does break, where do the different pieces of the door go? A. Everywhere; they are made out of cheap lumber, and are not strong.

"Q. Was this your actual knowledge and experience, that they do fly everywhere? A. Yes, sir.

"Q. Are you speaking of your own observation—what you have seen? A. Yes, sir."

CROSS-EXAMINATION.

"Q. This method of taking the doors out—how do they do that? A. They take a bar and knock it against the grain, and then put the power-lift on it, to throw them out.

"Q. Is it not a fact that they push them up on top of the grain, and they are afterwards taken out? A. They break them out; if they break in the middle it follows the least line of resistance and goes outside of the car, instead of up on the grain.

"Q. Isn't it true that they go up on the grain and are taken out and used again? A. I have seen them go every way; I have seen the fellows jump out of the way of them.

"Q. Do they put terrific power on those doors? A. It has to be pretty terrific to pull it up with the grain and nails in it.

"Q. It moves slow? A. Yes, sir.

"Q. Did you ever, in your experience, find any boards on top of the train? A. No, sir, I wasn't looking for them.

"Q. Did you ever see any on top of the train? A. No, sir, I never did.

"Q. Is it not a fact that after they unload the cars, they put the grain doors back in the cars, to be used again? A. They throw them outside, and if they get an order for grain doors, they put them in and ship them out; they keep a record of it.

"Q. Isn't it a fact that the elevator is receiving and loading out wheat at the same time? A. Yes, sir.

"Q. Sometimes loading and unloading at the same time? A. Yes, sir, sometimes.

"Q. And these grain doors are taken out of box cars, and they take them over and use them in cars, they are loading out? A. They

take them and pile them up and take them to the other end, where they can use them; they don't leave them in the car.''

JAMES A. DUDLEY.

''Q. Is that power-lift great enough to tear the nails loose, and pull the door up, with the wheat against it? A. It will lift it out, or split it, and tear it up.

''Q. What is your observation, with reference to splitting them? A. I have seen them split them all to pieces.

''Q. What would become of the pieces? A. If there was a short piece it would fly out of the car and sometimes the nails will hang, and let it tear out of the center, and leave the door on each side.

''Q. To what extent and what distance have you seen those pieces thrown from the cars? A. I have seen them thrown up as high again as the car itself.

''Q. You say you have seen these pieces of boards fly up twice as high as the cars? A. Yes, sir.

''Q. Wouldn't they hit the roof of the shed? A. They did on the Katy, yes, sir.

''Q. That is what we are talking about. A. They had a shed on both sides there.''

JOHN LAWRENCE SULLIVAN.

CROSS-EXAMINATION.

''Q. You have seen grain doors break there, at different times? A. Yes, sir.

''Q. And, when they would put this power-lift on there, and turn the juice on, it would take these double grain doors up, with electric power, and break the nails loose? A. It would be a slow movement.

''Q. I didn't ask you that. A. It would be slow.

''Q. I didn't ask that. It did take them up? A. Yes, sir.

''Q. This was electric power? A. Yes, sir.

''Q. And it would break the nails loose? A. Yes, sir.

''Q. And take the doors up, with all of that wheat against the door? A. Yes, sir.

''Q. It would be powerful, in order to do that? A. Yes, sir.''

It will be noted that the evidence does not show that doors were ''constantly'' broken in unloading cars. [Burnes v. Railroad, 129 Mo. 41, 1. c. 54, 31 S. W. 347]. Even so, plaintiff argues that it was reasonable and legitimate for the jury to infer from the evidence that a door was broken in unloading the cars in question. We do not think so. Of course, it is possible, but a mere possibility is not a foundation for an inference. A door or doors may or may not have been broken in unloading said cars. The jury could only guess about the matter. It is an open railroad yard, and the elevator is located between two public streets. After the last inspection of the car the board may have been picked from the ground by an employee of the elevator or by some person in or about the yard and either placed on

the brake platform or cast in such a way that it fell on the brake platform. Absent the inference that a door was broken in unloading the cars in question, there is no evidence tending to show that the board was on the platform at the time the car was last inspected. The burden was upon the plaintiff to show both negligence and causal connection. There was no substantial evidence tending to show causal connection.

Plaintiff quotes from 1 Wigmore on Evidence, page 258, article 41, as follows:

"On a charge of murder, the defendant's gun is found discharged; from this we infer that he discharged it, and from this we infer that it was his bullet which struck and killed the deceased. Or, the defendant is shown to have been sharpening a knife; from this we argue that he had a design to use it upon the deceased; and from this we argue that the fatal stab was the result of this design."

We think the authority is against the plaintiff. In the instant case no grain door was found broken or shown to have been broken.

He also relies on Cole v. Railway Co., 332 Mo. 999, 61 S. W. (2d) 344. In that case a switchman's foot slipped from the greasy stirrup of a ladder, and he was injured. It was admitted that grease was on the stirrup. However, defendant contended that the grease could have been placed thereon after the time for inspection of the car at the terminal, from which the train proceeded.

Plaintiff answered the contention by evidence tending to exclude every probability of oil or grease having been placed on the stirrup of the ladder after the train left the terminal. [Cole v. Railway Co., supra, 1. c. 346.]

The other cases cited do not sustain the contention of plaintiff on the question under consideration. The judgment should be reversed. It is so ordered. All concur.