JAMES LEONARD GUTHRIE, a minor, by MERIL GUTHRIE, his next friend, v. CITY OF ST. CHARLES, a Municipal Corporation, Appellant.—152 S. W. (2d) 91.

Court en Banc, June 10, 1941.

*Claude S. Tuttle* and *Watts & Gentry* for appellant.

*E. McD. Stevens, Earl G. Smith* and *B. H. Dyer* for respondent.

ELLISON, J.—The respondent, a boy 15 years old suing by next friend, recovered a judgment for $8,000 damages against the appellant City of St. Charles, for injuries sustained in an explosion of sewer gas emanating from a sanitary sewer into the basement of the home of Fred Hirsch, his neighbor. There had been a heavy rain that evening and surface water found its way into the sewer and thence flooded basements in the vicinity. The respondent and other children were on an expedition to rescue dogs, cats and fowls from the inundated area. They ventured to the top steps leading into the Hirsch basement with a lighted lantern. An explosion followed injuring respondent and others of the children, three of them fatally.

On this appeal the City makes three assignments: (1) that the trial court should have sustained its demurrer to the evidence, as requested at the close of the whole case; (2) that the court erred in giving respondent's Instruction No. 1; (3) that the verdict for $8,000 was excessive. Its basic contentions are that the verdict was speculative and conjectural, since there was no substantial evidence showing the explosion resulted from any cause for which the City was legally responsible, as against other possible causes for which it was not liable; and that because of the extraordinary nature of the casualty the city authorities in the exercise of reasonable care were not bound to have anticipated it.

Two sanitary sewers were involved. One, called the old sewer, was laid in 1906. A new relief sewer was built in 1929, starting from a connection with the old one at Ninth Street and Kingshighway, and closely paralleling it until the two rejoined at Fifth and Morgan streets about nine blocks further down. For the first four blocks of this distance the old sewer was constructed of 8 inch pipe; through the next three blocks, of 10 inch pipe; and for the remaining two blocks of 12 inch pipe. The new sewer was built entirely of 12 inch pipe. Thence to the Missouri River there was only a single 12 inch outlet line.

The Hirsch home was located about four blocks below the beginning point of the two parallel sanitary sewers and was served by the *new* one. For some ten days before the explosion a manhole on the *old* sewer two blocks below said beginning point had been left uncovered by certain W.P.A. workmen for their personal convenience, with the consent of the city engineer. They were engaged in the construction of a *storm* sewer, which was not connected with the sanitary sewers.

But when the heavy rain fell shortly before the explosion it covered the surrounding area with surface water, which was augmented by water gushing from the uncompleted storm sewer, so that the open W.P.A. manhole (as we shall call it) on the old sanitary sewer was submerged to a depth of two feet. This flooded the old sewer. But the new sewer also was flooded and regurgitated sewage into the Hirsch basement to a depth of several feet. This occurred although there were no open manholes on the new sewer, and its only connections with the old sewer were four blocks above and five blocks below the Hirsch home. These flood waters pushed ahead of them the gas that exploded.

The big question of fact in the case was, how did the flood waters get from the old sewer into the new sewer—or, to put it differently, was the open W.P.A. manhole on the old sewer a producing cause of the explosion on the new sewer. The city contended the flooding of the new sewer resulted from a wholly independent cause, namely an obstruction therein two blocks below the Hirsch home, which backed up the sewage in the new sewer and filled it to capacity, so that the flood waters in the old sewer could not enter the new sewer opposite the Hirsch home, and therefore could not have been a proximate cause of the explosion in the Hirsch basement. In addition to an assignment of negligence in permitting the W.P.A. manhole to remain uncovered, five other assignments of negligence were pleaded in respondent's petition charging faulty construction of the sanitary sewers, and failure to clean and ventilate them in specified manners.

At the close of all the evidence the appellant City offered an instruction in the nature of a demurrer to the evidence, which the court refused. After the overruling of the demurrer the respondent submitted its case to the jury on an Instruction No. 1 which hypothesized negligence in two respects only: (1) permitting large and unusual quantities of sewage to remain in the parallel sewers and to generate explosive sewer gas; (2) permitting the W.P.A. manhole to remain uncovered, whereby flood waters entered the old sewer and thence backed up into the Hirsch basement causing the explosion. Appellant assigned error in its motion for new trial to the overruling of its demurrer to the evidence, and renews that assignment in its brief here.

Appellant contends, first, that since respondent's instruction submitted only two issues, all other charges of negligence in the petition were abandoned. That is the law.* Next it asserts that the first of these two issues—about permitting sewage to remain in the sewers,

*Yuronis v. Wells, 322 Mo. 1039, 1046, 17 S. W. (2d) 517, 521; Doyle v. Merchants Bridge & Term. Ry. Co., 326 Mo. 425, 435, 31 S. W. (2d) 1010, 1013; Linders v. Peoples Motorbus Co., 326 Mo. 695, 699, 700, 32 S. W. (2d) 580, 581; Crossno v. Term. Rd. Co., 328 Mo. 826, 834, 41 S. W. (2d) 796, 800; State ex rel. Alton Rd. Co. v. Shain, 346 Mo. 681, 693, 143 S. W. (2d) 233, 239.

and gas to form—must be disregarded because it was broader than the petition. We shall take up that question when we come to consider the instruction. Finally, appellant says that with these charges of negligence eliminated, the propriety of the' circuit court's order overruling the demurrer to the evidence must be adjudged by this court solely on the remaining issue: whether there was substantial evidence showing the city guilty of actionable negligence as specified in the petition and instruction, in permitting the W.P.A. manhole to remain uncovered.

 Answering that third contention, respondent asserts that since the City's demurrer to the evidence was *general* we here in reviewing the order overruling it must disregard his *subsequent* abandonment of the five other assignments pleaded in the petition and put ourselves in the position of the trial court when the demurrer was submitted. Respondent further maintains that appellant's assignment in its motion for new trial and brief here, predicating error on the overruling of the demurrer, is not sufficient to raise the point that the single issue on which he (respondent) submitted his case to the jury was unsupported by substantial evidence. All this is on the theory that when the demurrer was interposed all six assignments of negligence were still in the case, and the circuit court may have thought some of the five assignments later abandoned were supported by substantial evidence—in which event it had to overrule the demurrer even though it believed the assignment on which the cause was subsequently submitted did not have evidential support.

These contentions are sustained by Gray v. Kurn, 345 Mo. 1027, 1041-2 (3, 4), 137 S. W. (2d) 558, 566 (6, 7), which respondent stresses. And that used to be the law. The rule formerly was that if a defendant wanted to save his point as to the insufficiency of the evidence on each pleaded assignment, he must demur to the evidence on each issue separately by requesting appropriate withdrawal instructions; and that he waived any error in the overruling of his general demurrer to the evidence by offering converse instructions on the issues submitted. [Torrance v. Pryor, 210 S. W. 430, 432(4).]

But the Torrance case was expressly overruled by Elkin v. St. Louis Pub. Serv. Co., 335 Mo. 951, 954, 74 S. W. (2d) 600, which has since been followed in five cases. These decisions hold that an assignment of error in the motion for new trial and on appeal to the overruling of defendant's general demurrer to the evidence does challenge the sufficency of the evidence—and this even though plaintiff had abandoned part of his pleaded assignments after the demurrer was overruled, and the defendant had requested converse instructions on the issues submitted. The theory of these decisions is that a general demurrer to the evidence challenges the sufficiency of the evidence on *every* pleaded assignment. And in Williams v. St. Louis Pub. Serv. Co., 335 Mo. 335, 340-1, 73 S. W. (2d) 199, 200-1, the

1184

converse was held. In that case after defendant's general demurrer to the evidence had been overruled the plaintiff abandoned part of his assignments. But the defendant obtained converse instructions on the issues submitted, and on appeal merely challenged plaintiff's instruction on those issues claiming there was no evidence to support them. He did *not* complain of the overruling of his general demurrer and because of that failure was held to have waived the insufficiency of the evidence.

In addition to the foregoing, there are three cases which explicitly sustain appellant's contention that, in the circumstances hypothesized above, the trial court's order overruling a defendant's general demurrer to the evidence will be adjudged on appeal only with reference to the sufficiency of the evidence on the issues submitted. These were not called to the court's attention in the Gray case. They are: Krinard v. Westerman, 279 Mo. 680, 688, 216 S. W. 938, 939-40(1); Karr v. C., R. I. & P. Ry. Co., 341 Mo. 536, 545, 108 S. W. (2d) 44, 48(2); Henry v. First Natl. Bank, 232 Mo. App. 1071, 1079(2).

In our opinion the better course is to adhere to the doctrine of the Elkin and Krinard cases. It is true that a demurrer to the evidence covering several assignments of negligence must be overruled if there is substantial evidence supporting any of them; and of course the trial court should not be convicted of error for so doing. But, after all, the demurrer is leveled at all the assignments; otherwise it would be an idle ceremony to tender it. And if the plaintiff later stands on only part of the assignments he does so knowing the evidence in support of them has been challenged. The judge likewise knows whether he regarded the selected assignments as having evidential support; and also knows that in allowing the case to reach the jury on the issues submitted he is impliedly holding there is substantial evidence on those issues. In other words he is inferentially admitting that the demurrer was overruled at least partly because of those assignments.

When the defendant in his motion for new trial and on appeal renews his exceptions to the overruling of his demurrer to the evidence, it must be understood by everyone that the complaint is directed to the assignments still in the case. Whether the others were supported by substantial evidence has become a moot question. The plaintiff has waived his rights under them. Appellate courts should not be required to search the whole record to find out whether the demurrer was properly overruled because there was evdence sustaining some assignment afterwards discarded. Neither should they be compelled to affirm the judgment on such purely technical grounds when there is no evidence to support it.

█ So, in passing on appellant's assignment here that its demurrer to the evidence was erroneously overruled, we confine ourselves to the issues submitted in respondent's instruction. Considering first the assignment that the explosion was caused by waters entering

the W.P.A. manhole on the old sewer and thence flooding the Hirsch basement on the new sewer. It will be remembered there were only two connections between the two parallel sewers: one at Ninth Street and Kingshighway *above* the elevation of the sewers at the W.P.A. manhole and the Hirsch basement; and the other at Fifth and Morgan streets, *below* these two points. If water ran from the manhole to the basement it must have traversed one or the other or both of those routes. And since water seeks its own level, the flood water standing two feet deep at its source over the open W.P.A. manhole must have been *higher* than the 3 to 5 foot level of water at its terminus in the Hirsch basement, and also higher than the highest point along the course between the two, which was at the Ninth Street junction.

Now the evidence does show the rise of the sewer from the flood water source and terminus to the Ninth Street junction was 3 inches per 100 feet, and it also shows the distance in blocks. But it does not give the number of feet in a block. And there is no other proof of the elevation of the sewers or the ground at any of these three points, except the sewer inlet into the Hirsch basement. In his brief respondent asks us to *assume* the distance from the W.P.A. manhole to the Ninth Street junction was 600 feet, and that the depth of the W.P.A. manhole was six feet. But we cannot do that. For these reasons we thought at first that respondent had omitted an element of proof vital to his case. But on reflection we believe the following testimony of the city engineer, who was respondent's witness, supplied that link. On direct examination he said (parenthesis ours):

"I knew that if that (W.P.A.) manhole cover were left off and a large amount of storm water got into the sewer it might back up in the basements. We never had gas in town in basements before that. I will say that in a way I knew it would be a dangerous situation. I had never had a similar situation where a manhole was open and a large amount of storm water poured into the sanitary sewer, but I knew that if that condition did happen it might create a dangerous situation, from an engineering standpoint."

Later he testified that two days after the explosion a large pan 18 to 24 inches in diameter was found in a manhole on the new sewer less than a block below the Hirsch home. It was the engineer's theory that this pan had been in the new sewer on the night of the casualty and had caused sewage to back up therein clear to the Ninth Street junction, thereby flooding the Hirsch basement and causing the explosion. It was his further view that this obstruction filled the new sewer to capacity as far as the Ninth Street junction, thereby completely excluding flood waters from the old sewer at that entrance so that they could not have been a proximate, concurrent cause of the explosion. With this thought in mind, counsel for the appellant City elicited the following from the city engineer on cross-examination:

"I said at about the close of my direct examination that as an

engineer I knew when I gave consent to the WPA people to take off the manhole cover . . . there was danger that the water might back up clear around where the old sewer and the new sewer began and that gas might come down the new sewer and it would be dangerous. I was failing to take into account these things that I have testified to, namely: . . ."

Here the engineer went on to explain what he meant by the things he had "testified to," that justified the retraction of his quoted testimony on direct examination. He said he believed after reflection that the pan in the manhole below the Hirsch home was the intervening and sole proximate cause of the explosion. We shall return to that question presently. The point we have in mind here is that on the matter of the relative *elevations* of the flood waters at their source and terminus, this testimony of the engineer is an admission that but for the pan a large amount of storm water flowing into the open W.P.A. manhole would or might back up around the Ninth Street junction and down the new sewer. This constitutes the missing link. However it still fails to make a prima facie case on the issue if we conclude the pan was the sole proximate cause of the explosion, or that there is no substantial evidence showing which was the cause as against the other. But before going into that, another question should be disposed of.

Respondent also contends the flood waters entering the W.P.A. manhole "spread in all directions." In other words he does not stand solely on the theory that the water *backed up* two blocks to the Ninth Street junction and thence ran down the new sewer to the Hirsch basement. He also contends it ran *down* the old sewer for seven blocks to the Fifth Street junction and thence *backed up* the new sewer for five blocks to the Hirsch basement. This theory is clearly untenable for the following reasons.

As already stated, the old sewer for the first four blocks was built of 8 inch pipe. The W.P.A. manhole was on this section. For the next three blocks it was 10 inch, and for the remaining two blocks 12 inch. Thence, from the Fifth street junction to the Missouri River there was a single 12 inch outlet. But the fall of both the old and new parallel sewers was only 3 inches per 100 feet, whereas the fall of the 12 inch outlet was 27.6 inches per 100 feet, or nine times as great. This increased gradient, plus the smaller dimensions of the old sewer, made the carrying capacity of the outlet much greater than that of the old sewer. Indeed, it was 60% greater than the combined capacities of the old and new parallel sewers. In other words the outlet could carry off free running water faster than both parallel sewers could deliver it at the junction. Consequently water from the old sewer would not back up into the new sewer unless it had been put under such pressure in the old sewer as to overtax the capacity of the outlet. There was testimony that a column of water in the W.P.A. manhole

would exert a pressure of about .44 pounds per foot of height, but there was no testimony whatever as to the relative elevations of water standing two feet deep above that manhole and in the sewer at the Fifth Street junction; or as to the amount of pressure required to overtax the capacity of the outlet pipe.

Going back now to appellant's contention that the pan obstructing the new sewer was the sole proximate cause of the explosion or at least an equally probable cause for which the appellant was not liable. The manhole where the pan was found the second day after the explosion was less than a block below the Hirsch home. It was in an alley and projected a foot or two above the ground. It was filled with sewage to the top and apparently had run over. Paper and other refuse had accumulated around the pan so that the sewer passage was practically closed. The elevation of this manhole was higher than the Hirsch basement, and as high as the junction point of the parallel sewers back at Ninth Street. When the pan was removed the sewage soon ran out.

Respondent's testimony showed these parallel sewers served practically the west half of St. Charles, a city of over 10,000 population, including Lindenwood College with 400 or 500 students, 800 to 1000 residences and numerous heavy users of water, such as laundries, garages, stores, restaurants and filling stations. If the pan completely or almost completely obstructed the new sewer at and before the explosion, with this volume of sewage it seems entirely probable that the sewer might have become filled to capacity up to the Ninth Street junction. Also the pan would block waters backing up from the Fifth Street junction below, and prevent them from getting as far as the Hirsch basement. In this connection it is noteworthy that out of the great number of services on both parallel sewers the only two basements flooded, so far as the evidence shows, were the adjacent Hirsch and Haislip basements, both on the new sewer above the pan. No basements below that point on the new sewer or anywhere on the old sewer which was unobstructed, seem to have been similarly affected.

But there was clear testimony for respondent that the waters in the Hirsch basement had receded by next morning. That means the pan could not have flooded the basement unless there was only a partial stoppage. The city engineer's testimony indicates such was the case: first, because the pan would become more and more of an obstruction as waste matter accumulated around it; and also because examination of a manhole further down the new sewer disclosed seepage which must have got past the pan. But on this theory how could the pan alone have backed up the sewage into the Hirsch basement so deep and quickly at and before the flood, and yet have permitted the basement to drain by morning? The water in the Haislip basement subsided even sooner.

It may be argued the high level of water in the basement was not

all backed up sewage, but was partly surface water which had run down the outside steps. There was some of that. Nevertheless, one witness, Miss Miller, saw the sewage enter from the sewer, and she remained until it was two or three feet deep. But even if part of the water came from the outside, that would mean that despite the pan more sewage was soon carried away by the sewer than had backed up. Appellant's expert witness, Mr. William Stoecker, would only say on this point that he thought the pan was "a decided contributing factor." Nobody knows whether the pan was in fact clogging the sewer at the time of the explosion two days before it was found. There is no testimony that basements above it were flooded throughout that time. The inferences are to the contrary.

The court gave an instruction for appellant that it was not liable if the jury believed the pan alone made the water and gas enter the Hirsch basement, causing the explosion; and that appellant did not know it was in the sewer and could not by the exercise of reasonable care have learned of that fact in time to have prevented the explosion. The jury found against appellant on that issue; and we are unable to say as a matter of law that their conclusion was unjustified. We grant that when a plaintiff's testimony merely shows a casualty resulted from either of two or more causes for only part of which the defendant is liable, no case is made. But here there is substantial evidence that the flooding of the parallel sewers through the uncovered W.P.A. manhole was the more probable cause. That does make a case for the jury. [Wills v. Berberich's Delivery Co., 345 Mo. 616, 626 (5, 6), 134 S. W. (2d) 125, 130 (7-11).]

■ Appellant further contends the explosion was so unusual, and resulted from such an unpredictable combination of circumstances, that it could not have been anticipated in the exercise of reasonable care. The city engineer, as respondent's witness, did testify such a thing had never happened before in St. Charles; and that sewer gas had never accumulated in basements before. Mr. Hirsch, the owner of the basement, said it had not overflowed in the previous five years. Respondent's brief sums up the adverse occurrences contributing to the explosion as follows: (1) the very heavy rainstorm; (2) the uncovered manhole; (3) the flooding of the sewers along a devious route; (4) the backing up of water in the basement; (5) the forcing of sewer gas into the basement past the vent pipe in the yard; (6) the presence of menthane gas with other gases in the sewer; (7) a combination of this gas with the oxygen in the air in the right proportions to make the mixture explosive; (8) and the bringing of a lantern lit by an open flame to that point. To this may be added the fact that the uncompleted storm sewer augmented the flood.

But any observable phenomenon, even in the ordinary affairs of life, when analyzed, usually involves the convergence of different forces or factors, and the operation of complicated laws of physics or

chemistry.. The average layman judges by probable results as gleaned from common experience. The city engineer, testifying for respondent, admitted he realized the flooding of the sanitary sewers with a large amount of storm water would produce a dangerous situation, as we have already shown by his quoted testimony. On cross-examination he attempted to retract that admission by saying he had not thought of the pan obstructing the new sewer as an intervening sole cause. But that very explanation is itself an admission of the danger, if the pan was not the sole cause.

Further, he admitted that when he found the flood waters swirling into the open W.P.A. manhole that night, he waded in at the risk of his life to cover the hole, because of the threatened danger. At another place in his testimony he said as soon as he heard the water was running into the manhole he wondered if the lid had been left off, and immediately went to the spot. Later he qualified this by saying the only danger he thought of was that basements would be flooded—not that an explosion would result.

There was also testimony that the parallel sewers had been giving off odors in the Hirsch neighborhood, especially in damp weather, though there was conflicting testimony that these smells came from an open ditch into which some sewage was discharged. The appellant's expert thought the explosion might have been caused by gasoline vapors in the sewer since it served some garages and filling stations. But there was no evidence that any gasoline had entered the sewer from these. Such evidence as was elicited on that point was negative. And no witness testified to smelling gasoline vapors. All the odors were offensive. But appellant does not rely on this evidence.

We think the officials and servants of the appellant city, as reasonably prudent men, were put on guard by the general knowledge: that all sanitary sewers contain gas, some of which is explosive when mixed with air and exposed to an open flame; that when such a sewer is filled to capacity with moving water the latter will push the gas ahead of it; and that open flames are common in population centers, as from lamps, lanterns, matches, furnaces, stoves, automobile exhausts, electric sparks and the like. The fact that a similar casualty has never happened before will not always excuse a defendant, 45 C. J., sec. 27, p. 658.

Appellant has cited a number of cases* holding that liability for

*Mann v. Pulliam, 344 Mo. 543. 127 S. W. (2d) 426: Carnahan v. M. K. & T. Ry. Co.. 338 Mo. 23, 30, 88 S. W. (2d) 1027. 1030; Jones v. St. L.-S. F. Ry. Co.. 333 Mo. 802, 812(3), 63 S. W. (2d) 94, 97(5); Jecker v. Grafeman-McIntosh Ice Cream Co., 326 Mo. 451, 457-8, 31 S. W. (2d) 974, 977(2); Nelson v. Heinz Stove Co.. 320 Mo. 655. 664. 8 S. W. (2d) 918, 921; State ex rel. Lusk v. Ellison, 271 Mo. 463, 473. 196 S. W. 1088, 1091; Ward v. Ely-Walker D. G. Co., 248 Mo. 348, 366, 154 S. W. 478, 483; Fuchs v. City of St. Louis, 167 Mo. 620, 645, 67 S. W. 610, 617.

1190

negligence is not to be predicated on hindsight but on reasonable foresight; and that a defendant is not legally responsible unless he omits precautions a reasonably prudent person would have taken to guard against the casualty. That is true, but it does not mean the defendant must have anticipated the very thing that happened. If a defendant in the exercise of ordinary care should have known the situation was unsafe and that some injury was likely to result, not that such was a mere remote possibility, he is dutybound to fend against it. [Gray v. Kurn, supra, 345 Mo. 1. c. 1043(6), 137 S. W. (2d) 1. c. 567 (12); Hamilton v. Standard Oil Co. (banc), 323 Mo. 531, 19 S. W. (2d) 679, 686(12).] From all the foregoing we conclude respondent made a prima facie case on the issue of negligence and causal connection, in permitting the W.P.A. manhole to remain open, especially in the vicinity of the unfinished storm sewer and during the season when heavy rains might be expected, the explosion having occurred on June 3, 1937.

Appellant stresses Fuchs v. City of St. Louis, supra, 167 Mo. 620, 67 S. W. 610, as an authority to the contrary. In that case there had been a fire in an oil yard, during which certain non-volatile oils (not gasoline) became mixed with water and ran over the cindered grounds of a railroad yard into a sewer inlet. Four days later, while the mouth of the sewer was closed by high waters of the Mississippi River, there was an explosion in a basement over the sewer about ten blocks from the oil yard, in which plaintiff's intestate was killed and the sewer blown open for a considerable distance. The widow sued, alleging the explosion was caused by gasses generated by these oils, and that the city had failed to ventilate the sewer so they might escape. The decision held: there was no substantial evidence that sufficient oil had entered the sewer to cause the explosion; that the temperature of the sewer was too low to make the oils generate gas; and that there was also sewer gas in the sewer, including menthane, which was equally or more likely to have caused the explosion. This statement is sufficient to show the facts of the case were not comparable to those here.

Next we turn to the contention that the other issue submitted by respondent's main instruction was outside the petition. This was whether the appellant negligently permitted large and unusual quantities of sewage to remain in the sewer and form large quantities of explosive sewer gas therein. The petition made no such direct charge. On the contrary it specified negligence in the faulty construction of the sewer and failure to clean and ventilate it by particular methods, *whereby* large (the petition does not say "unusual") quantities of sewage were collected and gas generated therein. These specific assignments as to faulty construction and methods of cleaning and ventilating were abandoned when respondent submitted his case to the jury. Yet the instruction permitted the jury to find generally

that large and unusual quantities of sewage were permitted to remain in the sewer and gas to form in *any* manner. This was broader than the petition and left the jury to rove on that issue. Still we think the error was not reversible because the issue was submitted in the conjunctive with the issue about the open W.P.A. manhole. The respondent was entitled to recover on the latter alone, and therefore assumed an unnecessary burden in annexing the other issue. [Tash v. St. L.-S. F. Ry. Co., 335 Mo. 1148, 1164, 76 S. W. (2d) 690, 698(9).]

Appellant says the instruction further assumes a disputed fact in requiring the jury to find that with the W.P.A. manhole left uncovered "the defendant city . . . knew, or by the exercise of reasonable care could have known, that surface water was liable to come into said manhole . . . and cause said sewer pipes to be filled with water and cause said water to back up into the basements of homes along and connected to said new sewer line . . ." The alleged unwarranted assumption is that with the manhole uncovered surface waters were liable to fill the sewers and flood basements on the new sewer. That is what the city engineer said he knew. True he said on cross-examination, after thinking about the pan obstructing the new sewer, that he did not believe the flood waters would enter that new sewer. But the night of the flood he thought so and waded out in the water to put the cover back. He did not know about the pan until two days later. The further conjunctive requirement is that the flood waters did enter the Hirsch basement. We see no error in the instruction.

The final assignment is that the verdict of $8,000 was excessive. The respondent was 15 years old at the time of the explosion. His physician, Dr. Neubeiser, who was pronounced by appellant's expert physician, Dr. Scheider, to be "one of the best doctors in St. Charles," said as a result of the burns received in the explosion the respondent suffered "from extensive third degree burns of both legs from his hips to his ankles; his face had second degree burns, and burns on his right hand and arm; he was in pretty extensive shock when admitted to the hospital. . . . A third degree burn consists of a burn severe enough to cause loss of skin. The third degree burns on the Guthrie boy were on both legs from the thigh to the ankle. They covered practically the entire leg, mostly on the posterior aspect of the legs. That is accompanied by a great deal of pain. This boy suffered sufficiently to require morphine.

"Plaintiff was in the hospital from June 3, 1937, until the 21st day of August, 1937. He was given the routine treatment for burns, which is a tannic acid spray after the raw surfaces were cleansed with alcohol. . . . However, in this burn there was a great deal of infection set in immediately which required the removal of the tannic acid crust which will increase the scarring beyond what would normally be expected. Anything that destroys the entire skin will destroy

the nerve supply of the skin. There were islands of good skin which although not normal, were not as extensively burned as other portions.

"The circulation of the blood going to the feet is not interfered with and in the leg it is not interfered with. However, such burns as this, that is around the entire leg or any extremity, would cause an obstruction of the return circulation to the body, and this destruction always leads to more or less damage to the muscles. I don't believe the boy could have been burned that severely without muscular damage. For short periods of exertion it will probably have very little effect, but the blood supply to the muscles is so permanently impaired and the formation of scar tissue is so great that it will limit his capacity to do manual labor. In my opinion the boy will not be able to do any prolonged manual labor without intervals of rest because he will have difficulty in sustaining any prolonged exertion.

"There is a permanent psychic shock from such burns. I mean that the patient becomes extremely nervous and apprehensive, and so continues as long as the raw surface has to be dressed; in other words, all such patients have fear. That affects their mental outlook for life as they grow older." If the boy's capacity for school work was all right before the injury, and afterward he couldn't keep up with his studies, in my opinion that condition could be caused from the psychic shock he got. "In my opinion the scar tissue that now appears on the boy's legs is a permanent injury. They will never heal up any better than they are now. If he has a slight abrasion on the skin I believe there will be a slight delay in healing but it shouldn't predispose to infection." On cross-examination the doctor said there were no open sores on either leg; that his youth was in respondent's favor, but where scar tissue replaces normal muscular tissue it never recovers; and that he had reached his maximum in physical repair at the time of the trial.

The appellant's expert thought respondent had suffered a total disability of not exceeding ten per cent in his legs. He said: "He will have the weakened tissue there from the scarring, probably some contraction and tightness, and always the likelihood that from the severe injury those tissues will be caused to break down as it would not if it were normal tissue. There is no dead tissue, but there is lowered vitality in it. There is a degeneration in the nerves in it, over the area of the scars. Degeneration is the same as atrophy. The blood supply is not gone and the nerves will likely regenerate. . . . . There will be some minor nervousness probably as the result of the accident . . . I know he had a shock to his nervous system. Anybody who went through what he did would have it. Such a nervous shock usually stays with a person the rest of his life. It is possible he will suffer from that the rest of his life; I just wouldn't say absolutely. I don't know that it is going to affect him in earning his

livelihood the rest of his life. I wouldn't definitely make a statement on that. I don't know.''

We are unable to say the verdict was excessive in view of. these injuries, the youth of respondent and the effect it will probably have on his life. [1 Parmele, Damage Verdicts, sec. 20, p. 284; 102 A. L. R., p. 1243, note.] Finding no reversible error, the judgment, is affirmed.

PER CURIAM:—The foregoing opinion by ELLISON, J., in Division Two is adopted as the opinion of the Court en Banc. All concur.