Julia M. QUINN, (Plaintiff) Respondent,

v.

Henry E. ROSENBERG, (Defendant) Appellant.

No. 31548.

St. Louis Court of Appeals.

Missouri.

Jan. 18, 1966.

Rehearing Denied Feb. 18, 1966.

William R. Kirby, St. Louis, for appellant.

Orville Richardson, Corinne Richardson, Hullverson, Richardson & Hullverson, St. Louis, for respondent.

RUDDY, Presiding Judge.

This action by plaintiff against defendant is in two counts. Count 1 alleges an assault and battery and Count 2 alleges a false arrest. A jury trial resulted in a verdict for the plaintiff on Count 1 in the amount of $500.00 actual and $1000.00 punitive damages and on Count 2 in the amount of $10,000 actual and $500 punitive damages. Defendant appeals asserting error in failing to sustain his motion for a directed verdict, error in three instructions and further contends that the amount of the verdict is excessive.

In determining whether the trial court erred in failing to sustain the defendant's motion for a directed verdict on both counts of the petition we will state the facts and circumstances favorable to plaintiff as shown by the evidence and give to plaintiff the benefit of all reasonable inferences which may be fairly drawn therefrom. Price v. Nicholson, Mo., 340 S.W.2d 1, 4, 5; Johnson v. Missouri-Kansas-Texas Railroad Company, Mo., 334 S.W.2d 41, 42.

Plaintiff, licensed to practice law in 1939, is married to William Quinn, also a lawyer. At the time of her testimony she was associated with her husband in the practice of the law under the firm name of Quinn and Quinn. Plaintiff did not engage in the active practice of the law until about two years prior to her testimony. However, prior to the two years she did help her husband in his law office, doing research and bookkeeping.

On August 20, 1958, she was in an automobile accident in Garden City, Kansas, in which accident she sustained injuries to her neck, shoulder and arms and the upper part of her body. Most of the injuries she sustained were to her right side. She also sustained a laceration of the head. She was hospitalized in Kansas and subsequently returned to St. Louis where she entered the Firmin Desloge Hospital for treatment of her injuries. Dr. William Stevens was the attending physician. He prescribed a cervical collar and a traction outfit for her to use in her home. On February 19, 1959, the time of the occurrence that forms the basis of this lawsuit, she was still taking traction treatments at her home and wore the cervical collar, except that on some occasions she did not wear it because it proved embarrassing and she would take it off. In 1940 her neck was injured in an accident in which the car in which she was riding was struck in the rear by another car. In addition to wearing the cervical collar and using the traction outfit, Dr. Stevens was also giving her some diathermy treatments in his office and she had a diathermy machine at home, which she used. Prior to the arrest involved in this suit, she was never arrested for any violation of the law.

Prior to February 19, 1959, plaintiff's husband was engaged to represent Aletha Joyce Davis in the prosecution of a Workmen's Compensation claim for an injury to the left knee, which Mrs. Davis claims she had sustained in May 1956 during her work with the Bemis Brothers Bag Company. Her claim for compensation was disputed by the employer and insurer. Mrs. Davis had been in the Park Lane Hospital under the care of defendant, Dr. Rosenberg, in July 1956 for a female condition, at which time she also complained of pain and ache in the left knee and leg. Because of the medical question involved in the case, plaintiff's husband asked plaintiff to go to the hospital and to the office of Dr. Henry Rosenberg to get copies of the record of medical service and treatment furnished to Mrs. Davis. Prior to going to the hospital and to the office of the defendant, plaintiff secured, from the Division of Workmen's Compensation, authorizations to inspect the records of the Park Lane

Hospital and the records of defendant, Dr. Rosenberg. These authorizations were issued by the Division of Workmen's Compensation under the provisions of § 287.140 (sub-divisions 5 and 6) RSMo 1959, V.A. M.S., which provide:

"5. The testimony of any physician who treated the employee shall be admissible in evidence in any proceedings for compensation under this chapter, subject to all of the provisions of section 287.210.

"6. Every hospital or other person furnishing the employee with medical aid shall permit its record to be copied by and shall furnish full information to the commission, the employer, the employee or his dependents and any other party to any proceedings for compensation under this chapter, and certified copies of such records shall be admissible in evidence in any such proceedings."

On February 19, 1959, plaintiff went to the Park Lane Hospital and arrived there about 12 noon. She had taken a portable photostat machine with her. She presented her authorization to Mary Knoplauch, the medical record librarian, and asked to see the medical records of Mrs. Davis. Mrs. Knoplauch refused permission to see the records but made a telephone call to defendant, Dr. Rosenberg, because it was the policy of the hospital not to show the hospital records to anyone until they had procured the patient's permission and the doctor's permission. The defendant told Mary Knoplauch to have the plaintiff come to his office and that he would talk to her there. Mary Knoplauch admitted that plaintiff presented an authorization from the Division of Workmen's Compensation but that she did not have the patient's signature, nor the doctor's signature to inspect the records. Immediately thereafter, plaintiff went to the office of defendant at 1467 North Union Boulevard. The office of the doctor is in a residence converted to office use and the doctor occupies the entire resi-

dence. The office has a waiting room, an archway into the nurse's or receptionist's office and another archway leading into a corridor. This corridor leads to a number of rooms used by the defendant in his treatment of patients.

The defendant employed Ozella Green who served in a number of capacities. She was the receptionist and it was her duty to see that each patient would sign a register when he or she arrived at the defendant's office. She took care of the defendant's files, kept his books, sterilized his instruments and prepared the patients for the defendant's treatment and services. When the defendant was ready for the patient she would take the patient to a treatment room.

Plaintiff arrived at defendant's office about 12:30 P.M. After entering the waiting room she proceeded to the desk in the nurse's office and presented both authorizations to the nurse and told the nurse that defendant knew that she was coming and asked the nurse to tell the defendant that she was there. There were several people in the waiting room and the nurse told plaintiff to be seated in the waiting room, that the doctor was busy. Thereafter, the nurse took the authorizations into the back quarters of the building. About an hour later, and while plaintiff waited in the waiting room, she saw defendant come into the nurse's room and look at the authorizations to inspect the medical records, which were lying on the nurse's desk. Defendant said something to the nurse and the nurse then looked at plaintiff and thereafter the doctor went back into the rear quarters of his office. Later, the defendant again came out to the nurse's desk at which time Mrs. Quinn nodded a recognition to him but the doctor said nothing to her. He went back into the rear portion of his office again. About 2:30 P.M. plaintiff left defendant's office and telephoned her husband and Vernon Meyer, who was then the Referee in charge of the Workmen's Compensation office in St. Louis, Missouri, and who is now Honor-

able Vernon Meyer, one of the Judges of the Twenty Second Judicial Circuit of Missouri. Plaintiff advised Judge Meyer that she was unable to inspect the records in the doctor's office and thereafter Judge Meyer called defendant's office. Judge Meyer did not talk to Dr. Rosenberg but spoke to the girl who answered the phone and told her that if Dr. Rosenberg had treated someone who had an industrial injury that plaintiff, on behalf of the employee, was entitled to inspect his medical records upon the showing of the authorization from his department.

After calling Judge Meyer, plaintiff returned to the defendant's office and again asked the nurse, Ozella Green, if she could see the doctor. The nurse told her that she could not, that the doctor was still busy and was told to be seated. After waiting about another hour, defendant's nurse gave plaintiff the authorizations she had given to the nurse. About 3:30 P.M. plaintiff again asked the nurse about seeing the doctor. The office had become empty except for one gentleman who plaintiff saw come in through the archway and who she thought was an employee of the defendant. He was standing behind the nurse's desk and was talking to the nurse. She later learned he was Moses Bradford. In answer to plaintiff's last request, the nurse told plaintiff she could see the doctor. Plaintiff left her photostat machine behind the nurse's desk and turned to go into the archway and asked the nurse, "Well, which way should I go?" and the nurse answered, "that way," pointing to the left. Plaintiff entered the corridor that led to the treatment rooms and the doors of the rooms were all closed. At this time plaintiff had both authorizations with her. Not knowing which office the defendant was in, she called out, "Dr. Rosenberg, Dr. Rosenberg." She did not know which office he was in and called out loud enough so that she thought she could be heard by him. When plaintiff was asked what happened, she answered:

"Well, about that time someone came up behind me and grabbed ahold of my left arm and swung me kind of around to the side, and I said, 'Are you Dr. Rosenberg?' And he said, 'You get out of here, you get out of here, you haven't got any business in here.' And I said, 'Well, just a minute, just a minute, let me explain, please.' And he didn't give me time to explain. The first thing I know he had my arm up behind my back. * * * My left one, and I couldn't have gotten out of the place if I wanted to, he was blocking my way, standing to the side of me. So he got me behind the back here and he held on to me and I said, 'Oh, don't hurt my neck, please, please, just leave me go.' And I said, 'I have been in an automobile accident, you are hurting me.' And I said, 'I am still under the treatment of a doctor.' He said, 'Treatment, I'll give you a treatment, you'll remember the treatment I'll give you,' and then I was on my way out."

Defendant did not ask plaintiff to leave before he grabbed her. He just told her, "to get out of there, get out of there." While he had a hold of her, he pushed her through the archway out into the nurse's room. He then pushed her through the nurse's room and all during that time she was trying to get away from him. He pushed her across the waiting room lobby and pushed her into a chair against the wall. As he did so he said, "If you were a man I'd bust you right in your nose, in your mouth." Defendant was holding plaintiff during the "entire time" and had a hold of her neck. He would not let plaintiff tell him why she was there and what she was doing there. He was furious. She felt terrible and was really upset. Plaintiff was not kicking, stomping, biting or screaming. She said she just wanted to get away from the defendant. Thereafter, defendant told his nurse to call the police, but she refused and told defendant to call them. Defendant then called the police and asked them to come over to the office. Thereafter, he left the waiting room and went into the back portion of his office.

Plaintiff remained seated in the waiting room. Before calling the police, the defendant would run to the nurse and then run back over to the plaintiff and stand over the plaintiff and plaintiff said she was afraid to even look up. Plaintiff did not think she could leave because the police were coming and she thought it was her duty to remain there. She said, "The main reason was I didn't want it to appear that I was fleeing from the police."

Officers Mead and Smith responded to defendant's call for the police. Upon arrival they found the plaintiff sitting in the waiting room. Upon ascertaining that defendant, Dr. Rosenberg, had made the telephone call, they went back into an examining room in the rear of the office and asked the defendant what seemed to be the trouble and he said he had a woman in his office that he "wished to leave" and told the police to "get that woman out of my office." The officers then went with the defendant to the waiting room and plaintiff showed the officers the authorization to see the records in the defendant's files and defendant told the police that he did not care to show them to the plaintiff. Defendant requested that plaintiff leave but she would not leave the doctor's office. However, the police officers said they detained plaintiff in order to determine the nature of the trouble. Thereafter, defendant asked the police officers to arrest the plaintiff on the charge of individual peace disturbance. The officers then informed plaintiff that she was being arrested for individual peace disturbance and thereupon plaintiff requested the police to arrest Dr. Rosenberg for individual peace disturbance and both were arrested by the officers. A patrol wagon came at the request of the officers.

Plaintiff said her experience at defendant's office was embarrassing and humiliating. Plaintiff was nervous and upset at the time and asked the police if they would take her to the City Hospital. She was conveyed to the City Hospital by the police who were in charge of the patrol wagon. She described the patrol wagon as a closed van which had doors in the rear and she believed it could be locked. The police went with plaintiff into the City Hospital and plaintiff entered the emergency room where she was examined. The hospital record introduced into evidence showed that plaintiff was admitted at 5 P.M., gave her occupation as a process server; that she was brought in a patrol wagon and left in the receiving room by the police. The history in the record showed that she had been in an automobile accident a year before; tenderness over the neck and right shoulder; weakness of right hand; X-rays taken and some loss of the normal cervical lordotic curve. She was at the City Hospital about two hours and the police sat beside her all of the time she was in the emergency room. She was in the custody of the police during all of the time she was in attendance at the City Hospital. Her husband arrived while she was at the hospital. After leaving the hospital she was conveyed to the Twelfth District Police Station (which was about two and one-half blocks from defendant's office) in the patrol wagon. Her husband was not permitted to ride with her and he went to the station by other means and met her there. At the police station certain information was asked of her and recorded on the police records and she was booked and her husband arranged for her to be released on bond. She was in the custody of the police approximately four hours. The case against her of individual peace disturbance was never prosecuted by the defendant and the charge was dropped and dismissed. Several days after the incident in defendant's office, plaintiff had "black and blue places" on her left arm. She said her shoulder and neck had been injured. The booking at the police department consisted of the filling out of a formal form which is referred to, variously, as the blotter, booking or register. This record of the arrest made at the district station is forwarded to the Central Police Headquarters where it

is kept in the record room. At the Central Police Headquarters it constitutes a part of the permanent records of the police department. The rules and regulations of the police department concerning the accessibility of records of arrested persons to anyone making inquiry, permits certain persons to purchase these records. The persons described were attorneys, persons involved in the case, investigators for an insurance company, an institution that may be contemplating extending credit to an individual, lenders of money, an employer who is contemplating employing a person in a position of trust, a fraternal organization representative and, as said by the commander of the records division of the police department, numerous other persons. The records of the police department are not open to the public generally but anyone who goes down to see the records must state the purpose for which he wants to see them. A microfilm reproduction of the record relating to plaintiff was introduced into evidence and the record shows the name of the plaintiff, the date of her arrest, and the charge that was made against her. In addition to this record, the police report originally made by the arresting officer is kept on file by the police department and is subjected to a more limited inspection than the other police records.

The ordinance which plaintiff was charged with violating (§ 20, Chap. 46, Vol. 1, p. 685, Revised Code of the City of St. Louis 1948) and which was read into evidence, provides:

"Any person who shall disturb the peace of others by noisy, riotous or disorderly conduct, or by violent, tumultuous, offensive or obstreperous conduct or carriage, or by loud and unusual noises, or by unseemly, profane, obscene, indecent, lewd or offensive language, calculated to provoke a breach of the peace, or by assaulting, striking or fighting another in any park, street, alley, highway, thoroughfare, public place or public resort within the city, or any person who, in the city, shall permit any such conduct in or upon any house or premises owned or possessed by him or under his management or control, so that others in the vicinity are disturbed thereby, shall be deemed guilty of a misdemeanor."

We omit defendant's evidence, except that which is favorable to plaintiff. The defendant in his testimony denied most of the facts testified to in plaintiff's case. He denied that he ever grabbed plaintiff by the back of the neck or bent her left arm up behind her. However, he admitted that plaintiff said, "Turn me loose, Doctor, turn me loose. * * * You're hurting me." He denied that he asked the police to arrest the plaintiff.

Defendant said he had no recollection of receiving a telephone call from the medical record librarian of Park Lane Hospital that plaintiff was there to inspect the records of Aletha Davis and he denied that he told the librarian that plaintiff could not see the records requested without his consent. Defendant knew what an authorization from the Division of Workmen's Compensation was and said that he would have given plaintiff permission to inspect the records at the Park Lane Hospital without the consent of Aletha Davis, if plaintiff had an authorization from the Division of Workmen's Compensation. He denied that his nurse informed him that plaintiff had such an authorization, stating that the nurse merely told him that plaintiff wanted to see some records of a patient.

The nurse, Ozella Green, testified in defendant's case that plaintiff was the last one in the waiting room when she (plaintiff) went back into the corridor. She said that plaintiff talked to her about three times and that each time she told the defendant of plaintiff's request. She further testified that when plaintiff was back in the corridor she heard her call out, "Dr. Rosenberg, Dr. Rosenberg." She saw defendant bring plaintiff out, at which time "he was holding

her arm and pulling her on out and she was saying for him to turn her loose." She said that plaintiff said "Turn me loose, Dr. Rosenberg, you're hurting me." She said that defendant sat plaintiff down in a chair and that plaintiff was sitting in the chair crying and did not get up until the police came and helped her.

■ Defendant asserts numerous points in support of his contentions and a number of the points are directed to the contention that plaintiff failed to make a submissible case under Count 1 for assault and battery and under Count 2 for false arrest. In reviewing this contention we confine ourselves to the issues submitted in plaintiff's instructions and determine whether the evidence offered was sufficient to make a submissible case under the theories of liability submitted. Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S.W.2d 91, l.c. 96; Bean v. St. Louis Public Service Co., Mo.App., 233 S.W.2d 782, l.c. 785.

Turning to Instruction No. 3, which submitted plaintiff's case of assault and battery, said instruction required the jury to find from the evidence that plaintiff "was told by the receptionist at the defendant's office that she could go in to see the defendant, and that she then passed through an archway and into an east-west corridor, and that while she was there, the defendant came up to her and without first asking her to leave and giving her a reasonable opportunity to do so, if so, did lay his hands upon her and used physical force to propel her into his waiting room, and that he used this force intentionally and without just cause or excuse, and that such force caused her to suffer bodily pain and injury * *."

Defendant's principal claims in support of his contention that plaintiff failed to make a submissible case under Count 1 is that plaintiff was a trespasser and was wrongfully there and under such misrepresentations as to constitute a fraud. In further support of this contention, defendant claims that Ozella Green, the recep-

tionist, had no authority to give plaintiff permission or direction to go back into the east-west corridor.

■ Plaintiff in answer to this claim that she was a trespasser asserts that it makes no difference whether she was a trespasser, licensee, or invitee since no force of any kind may be used to expel a trespasser without first requesting her to leave and giving her a reasonable opportunity to do so. With this we agree.

In the case of Cunningham v. Reagan, Mo., 273 S.W.2d 174, the case was submitted to the jury on defendant's theory that plaintiff became a trespasser upon the premises; and that if defendant used only necessary reasonable force to cause plaintiff's removal from such premises, the assault and battery were justified. The Supreme Court in its opinion assumed that for their purposes the plaintiff was a trespasser upon the land rented to the defendant. The court then said: "And we, of course, agree that the tenant had the right, if plaintiff was a trespasser, to order plaintiff off the premises and, in the event of his failure to leave after a reasonable opportunity to do so, defendant had the legal right to use whatever force (within limits not here important) was reasonably necessary to cause plaintiff to leave the premises." (273 S.W.2d l.c. 175, 176.)

In Restatement, Second, Torts § 77, p. 133, it is said:

"An actor is privileged to use reasonable force, not intended or likely to cause death or serious bodily harm, to prevent or terminate another's intrusion upon the actor's land or chattels, if

* * * * * *

"(c) the actor has first requested the other to desist and the other has disregarded the request, * * *."

■ However, we think there was sufficient evidence to support plaintiff's submitted theory in her Instruction No. 3, that

"the defendant came up to her and without first asking her to leave and giving her a reasonable opportunity to do so," assaulted her by the intentional use of force "without just cause or excuse."

■ Plaintiff's evidence showed that when she called at the Park Lane Hospital, Mrs. Knoplauch, the medical librarian, after refusing plaintiff's right to see the records, telephoned the defendant and he told her to have the plaintiff come to his office and he would talk to her there. Pursuant to this invitation, plaintiff went to the office of defendant and presented to the receptionist both authorizations she had procured from the Division of Workmen's Compensation. Under these circumstances plaintiff was not a trespasser at the time she entered defendant's office and presented her written authorizations to the receptionist. Plaintiff's evidence further shows that thereafter defendant saw these authorizations and plaintiff was not told to leave but rather was given to understand that the defendant would see her later in the day.

However, defendant contends that if plaintiff was not a trespasser at that time she later became a trespasser by walking from the waiting room into the east-west corridor. Defendant fails in this claim because plaintiff's evidence clearly shows that the nurse receptionist returned the authorizations to plaintiff and after plaintiff's last request to see the defendant, the nurse receptionist told plaintiff she could see the doctor. Ozella Green, the receptionist, in answer to plaintiff's request as to which way she should go, told her "that way," pointing to the left. Pursuant to the directions of the receptionist, plaintiff entered the corridor that led to the treatment rooms and finding the doors of all the rooms closed, called out, "Dr. Rosenberg, Dr. Rosenberg." These facts sufficiently supported plaintiff's Instruction No. 3 which required the jury to find that plaintiff "was told by the receptionist at the defendant's office that she could go in to see the defendant, and that she then

passed through an archway and into the east-west corridor, * * *." These facts, if found by the jury, would demonstrate that plaintiff had a legal right to be there and under no circumstances would plaintiff be a trespasser. Plaintiff's evidence also shows she was not asked to leave before defendant laid his hands upon her.

■ In further support of the claim that plaintiff was a trespasser, defendant charges that plaintiff misrepresented her right to see the records of the Park Lane Hospital and of the defendant and that this misrepresentation amounted to a fraud upon the defendant. Defendant says that subdivision 6 of § 287.140 RSMo 1959, V.A. M.S., under which the authorizations were issued, pertained to medical and hospital treatment furnished by the employer for an injury under the Workmen's Compensation Act, and contends that Aletha Davis was not treated at either place for a work injury. The evidence favorable to plaintiff shows that the Workmen's Compensation claim of Aletha Davis involved an injury to her left leg and left knee and that she had complained to the defendant about her left leg when she saw him in connection with her female trouble. We feel, as contended by the plaintiff, that apart from any statute, plaintiff had a duty and right to investigate her client's claim and in connection therewith to call at the Park Lane Hospital and the defendant's office and seek to inspect their records of the treatment, if any, of their client's work injury. We also think that under the evidence in this case plaintiff had a right under § 287.140, supra, to inspect the records of the hospital and the doctor. It is interesting to note that the defendant testified that he knew what an authorization from the Division of Workmen's Compensation was and said he would have given plaintiff permission to inspect the records of the hospital and of his office if plaintiff had an authorization from the Division of Workmen's Compensation. While he denied that his nurse informed him plaintiff had such an authorization, this was a matter of believ-

ability for the jury. We rule that there is no evidence showing that plaintiff misrepresented her right to see the records in question and that no fraud was committed upon the defendant.

■ In answer to the claim of the defendant that Ozella Green, the receptionist, had no authority to give plaintiff permission and direction to go back into the east-west corridor, we think the evidence shows that the receptionist did have this authority and permission of the defendant and that plaintiff had the right to infer from the facts and circumstances she witnessed in the doctor's office, concerning the duties and activities of the receptionist, that she had the authority to direct the plaintiff into the corridor and into the direction where she would find the defendant.

In the case of State ex rel. Massman v. Bland, 355 Mo. 17, 194 S.W.2d 42, 1.c. 46, the Supreme Court approved a general statement of the law as follows:

> "That where a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform on behalf of his principal a particular act, such particular act having been performed, the principal is estopped, as against such innocent third person, from denying the agent's authority to perform it."

This claim of defendant must fail.

As we have pointed out, even if plaintiff was a trespasser, defendant had no right to use physical force on her to remove her from his office until he had asked her to leave and had given her a reasonable opportunity to do so. However, plaintiff's evidence was sufficient to support a finding by the jury that she had a right to enter the east-west corridor and at that time defendant had no right to use physical force on her to remove her from his office. We rule that plaintiff made a submissible case under Count 1, alleging assault and battery.

We now turn our attention to the other part of defendant's contention that plaintiff failed to make a submissible case of false arrest under Count 2. The pertinent parts of plaintiff's Instruction No. 5 which submitted the issue of false arrest required the jury to find that plaintiff was told by the receptionist at the defendant's office that she could go in to see the defendant and that after plaintiff passed through the archway between the receptionist's room and the east-west corridor, she called out the doctor's name. The instruction continued, " * * * but did not use loud or boisterous language in so doing, and that the defendant then came up to her and used loud and boisterous language himself, and that he then became angry and out of peace because he had found her in the east-west corridor and that Mrs. Quinn did not raise her voice until after the doctor used loud and boisterous language to her, and that he remained upset and out of peace while conducting her to the waiting room and until she was arrested, and that the only commotion she made in his waiting room was to cry.

"Then you are instructed that Mrs. Quinn was not guilty of peace disturbance in violation of the City Ordinance read to you, and if you so find and then further find that the defendant did not have reasonable grounds for suspecting that she was guilty of the offense of peace disturbance, and that he caused her to be arrested by police officers of the City of St. Louis, and that she was then deprived of her liberty and in the custody of the police until she was released on bond at the police station, and that the charge of peace disturbance made against her was dismissed, * * *" then the jury was told if they found that plaintiff sustained compensatory or actual damages, their verdict should be in favor of plaintiff.

Here again, defendant asserts numerous points in support of his contention. We think plaintiff has correctly categorized them when she defines defendant's claims in support of his contention as (1) that plaintiff was guilty of a breach of defendant's peace and that reasonable ground for her arrest existed, and (2) that she consented or assented to her own arrest and invited the same by remaining on the premises until the police arrived.

■ Before the peace of the defendant could be disturbed he had to be within the peace. In the case of the City of St. Louis v. Sage, Mo.App., 254 S.W.2d 252, l.c. 254, this court, in quoting from the case of State v. Rogers, Mo.App., 8 S.W.2d 1073, 1074, said:

> "The statute makes it a misdemeanor to disturb the peace of an individual by loud and unusual noise or offensive and indecent conversation, etc. The peace of an individual cannot be disturbed, unless the individual is within the peace. State v. Davenport, 221 Mo.App. 37, 297 S.W. 713. To charge that the peace of an individual is willfully disturbed is equivalent to charging that the individual is within the peace. A person not in the peace could be further provoked, but unless he is in 'repose of mind and peaceful intent' his peace cannot be disturbed. State v. Davenport, supra."

There is no evidence to show that plaintiff used loud or boisterous language while in the corridor or elsewhere but there is plenty of evidence favorable to plaintiff, which could be believed by the jury, that defendant was out of peace. Plaintiff's evidence was sufficient to show that defendant was angry at plaintiff's presence in the corridor and showed his displeasure by assaulting plaintiff in the manner described heretofore and when plaintiff informed the doctor that she was under treatment by a doctor and asked him not to hurt her, he said, "Treatment, I'll give you a treatment, you'll remember the treat-

ment I'll give you." Thereafter, continuing his loud and boisterous conduct and evident displeasure at what plaintiff had done, said, "If you were a man I'd bust you right in your nose, in your mouth." These words of defendant and his assault in conducting plaintiff out of the corridor into the waiting room and defendant's conduct in running to the nurse and running back to the plaintiff and standing over the plaintiff were sufficient for the jury to find that he was "out of peace" before plaintiff raised her voice in protest at his assault. All of this was done by the defendant despite the fact that plaintiff did not use loud or boisterous language preceding his aforesaid conduct.

Plaintiff was not guilty of any conduct "calculated to provoke a breach of the peace," City of St. Louis v. Slupsky, 254 Mo. 309, 162 S.W. 155, 49 L.R.A.,N.S., 919, because prior to defendant's loud and boisterous language and his subsequent conduct, plaintiff merely called out "Dr. Rosenberg, Dr. Rosenberg." While she did protest defendant's assault and injury to her person and did cry in the waiting room, this occurred after the defendant was "out of peace" and was a normal reaction to defendant's abusive language and assault.

While the St. Louis Ordinance, heretofore quoted, provides that a peace disturbance may be caused by the commission of other conduct and language described in the ordinance, we feel it was unnecessary to prove or submit to the jury that plaintiff was not guilty of conduct or the use of language other than the "loud and boisterous" type charged against her, inasmuch as defendant testified to no conduct or language of plaintiff within the ordinance, except "loud and boisterous language."

Further, the jury could have found from plaintiff's evidence that the defendant had no reasonable grounds for suspecting that she was guilty of peace disturbance. As we have pointed out, there was sufficient evidence from which the jury could find

that plaintiff was in the east-west corridor because she had been directed there by the receptionist and that while there she used no loud or boisterous language and that it was the defendant who used loud and boisterous language, became angry and "out of peace." We think the evidence favorable to plaintiff clearly shows that the jury could have found that the defendant did not have reasonable grounds for suspecting that plaintiff was guilty of peace disturbance.

As pointed out by plaintiff, defendant seems to contend that plaintiff should have left the waiting room after she was ejected from the east-west corridor by the defendant. If we assume that she should or might have done so, this would not be a sufficient reason for having her arrested for peace disturbance, since all she was doing in the waiting room at the time was crying because of defendant's conduct and assault. See Hoagland v. Forest Park Highlands Amusement Co., 170 Mo. 335, 70 S.W. 878, and Cummins v. St. Louis Amusement Co., Mo.App., 147 S.W.2d 190, where the court discussed the assertion of a wrong reason for an assault in removing a person from premises.

 Answering defendant's claim that plaintiff consented and invited her arrest by remaining in defendant's waiting room until the police arrived, we point to the evidence favorable to plaintiff which shows that plaintiff thought she had to wait in the waiting room, inasmuch as defendant had called the police and she did not want to give the appearance of being guilty or fleeing from the police. Also, as pointed out by plaintiff, she was upset and injured by defendant's treatment of her and she can hardly be blamed for waiting in the waiting room to compose herself. We do not see anything in the evidence adduced by plaintiff that would support defendant's claim that she consented to and invited her arrest. It should be noted that she was arrested for peace dis-

turbance and not for trespass. We have examined the authorities cited by the defendant and find them inapplicable. In the case of Wehrman v. Liberty Petroleum Company, Mo.App., 382 S.W.2d 56, the evidence showed that plaintiff told one of the defendants, in effect, to go ahead and call the police. We held that this evidence, wherein plaintiff said to go ahead and call the police, would not justify an inference that plaintiff thereby consented to his subsequent arrest. As plaintiff points out, the evidence of "consent" was much stronger in that case than in the case at bar. This claim of defendant must fail. We rule that plaintiff made a submissible case under Count 2 alleging false arrest.

The next principal contention made by defendant is that the trial court erred in giving and reading to the jury, at the request of plaintiff, Instruction No. 5 covering the charge of false arrest. All of the claims made by defendant in support of his contention that plaintiff failed to make a submissible case and what we have said regarding that contention is a sufficient answer to the instant contention.

The same is true of defendant's next contention, namely, that the trial court erred in giving and reading to the jury, at the request of the plaintiff, Instruction No. 3 submitting assault and battery. The basis of defendant's claims made in support of this contention and his entire argument are predicated on the conclusion that plaintiff at all times was a trespasser. This claim has been sufficiently discussed heretofore. The instruction challenged was sufficiently supported by credible evidence.

 Defendant next contends that Instruction No. 7 covering damages that may be recovered for "injuries, if any, and bodily pain, mental anguish and humiliation, if any" suffered by plaintiff "as a direct result of the force used upon her as mentioned in Instruction No. 3" (assault and battery) permitted the allowance of a double recovery.

Defendant's argument in support of this contention is not clear and the authorities cited in support of this contention present entirely different forms of instruction. The principal authority relied on by defendant in this connection is Alexander v. Kansas City Public Service Co., Mo.App., 268 S.W.2d 451, 454. This case involved an instruction which permitted recovery for "injuries" *and* "for such aggravation or intensification of a previous existing abnormal condition, * * *." The court in that case held that the instruction was erroneous because it permitted a double recovery. The instant instruction does not permit such a recovery and, of course, as pointed out, limits recovery to such injuries suffered "as a direct result of the force used upon her as mentioned in Instruction No. 3" for assault and battery. It obviously limited recovery to such injuries as plaintiff suffered by reason of the assault.

Defendant next complains that the instruction permitted recovery for "humiliation" and that Instruction No. 8, which was an instruction for recoverable damages under Count 2 (false arrest) included the same item of damage. It is unnecessary to set out Instruction No. 8. It is sufficient to state that the instruction does not use the term "humiliation." However, under its language the jury was permitted to consider the humiliation suffered by plaintiff, but Instruction No. 8 limits the damages to such as resulted from her arrest and loss of liberty as mentioned in Instruction No. 5. We find no error in either instruction in this connection.

Defendant further claims that Instruction No. 7 told the jury they were required to assess punitive damages. It does no such thing. It merely permits the jury to assess punitive damages if they find from the evidence that defendant's use of physical force on the plaintiff was willful and malicious as the words were defined in another instruction.

Other complaints against this instruction made by the defendant have been answered in our discussion of other points and should not and need not be repeated here.

The final contention made by defendant is that the verdict of the jury under Count 2 is excessive. In support of this contention defendant cites many cases, most of which were decided many years ago and under entirely different economic conditions. Frankly, some of the cases approved sums for actual damages, which, when considered in the light of the deflated value of the dollar today as compared to the value of the dollar at the time the case was decided, would support the $10,000 judgment in the instant case for actual damages. In this connection we limit our discussion to the verdict of $10,000 for actual damages returned by the jury under Count 2 for false arrest. This seems to be the only verdict that concerned defendant in the argument contained in his brief.

In our examination of the cases the items of damage recoverable by plaintiff take a wide range. In reading the cases plaintiff may recover for the humiliation or mental suffering sustained. The jury may consider her station in life, the fact that she is a lawyer, a wife and a mother of minor children, the fact that she has never been arrested before and that there was no evidence that would show the lack of an impeccable reputation.

As pointed out by plaintiff there are many intangibles and imponderables that may be considered in calculating damages in a false arrest case. We think the considerations that should be given to the verdict under discussion in this case are best epitomized in the case of Huffstutler v. Coates, Mo., 335 S.W.2d 70, wherein the court affirmed an award of $7000 actual damages and $3000 punitive damages and in doing so quoted with approval from the case of Carp v. Queen Insurance Co.,

203 Mo. 295, 360, 101 S.W. 78, 99, which was a case involving malicious prosecution and therefore not unlike the instant case. In the matter of the consideration of damages the court in the Carp case said:

> "The law concedes a wide latitude of discretion to the jury in actions of this class, and their verdict should not be interfered with unless the appellate court can say it was the result of prejudice, passion, or malice. Numerous considerations must necessarily enter into the question of what is just compensation in such a case, but no definite rule can be laid down to any of them. The law has provided that the jury shall decide this question. Disgrace is a relative term. What is such to one man is not necessarily so to another; and, while it applies to each, its effect or measure is great or small as other conditions exist. Mental anxiety and pain caused thereby, and humiliation and danger from a prosecution for a grave criminal offense, are all conditions for the jury, as well as the jeopardy in which the liberty of the plaintiff was placed by such prosecution. We are unable to say, after a careful consideration of all this evidence, that the verdict of the jury was such as to evince passion, prejudice, or malice towards the defendants by the jury." (101 S.W. 1. c. 99).

In the Carp case the Supreme Court held a verdict of $12,500 was not excessive. In addition to all of the elements that the jury may consider as outlined in the above quotation, we add the fact that plaintiff was a practicing lawyer, to whom an unmarred and unblemished reputation for peacefulness and obedience to the law is of great importance in the practice of her profession. Certainly a charge of peace disturbance against a lawyer is likely to produce greater damage to the lawyer's future, than to one who gains a livelihood in a nonprofessional area. The learned trial judge did not consider the verdict excessive or the result of passion, prejudice or malice. Neither do we. This contention must be ruled against defendant.

We think defendant had a fair and impartial trial and the issues for the most part depended upon the credibility of plaintiff and defendant and, obviously, the jury believed the plaintiff.

The judgment should be affirmed. It is so ordered.

ANDERSON, J., and FRANK D. CONNETT, Jr., Special Judge, concur.